## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

JOHN LEE PUGH,

      Petitioner,

v.                                                    Case No. 5:21-cv-151-TKW/MJF

RICKY D. DIXON,[1]

      Respondent.

_____/

## **ORDER and**
## **REPORT AND RECOMMENDATION**

Petitioner John Lee Pugh, proceeding *pro se*, has filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. Doc. 1. Respondent ("the State") answered, providing relevant portions of the state court record. Doc. 10. Pugh replied. Doc. 15. The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Pugh is not entitled to habeas relief.[2]

---

[1] Ricky D. Dixon succeeded Mark S. Inch as Secretary of the Florida Department of Corrections, and is automatically substituted as Respondent. Fed. R. Civ. P. 25(d).

[2] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY[3]

On December 9, 2010, around midnight, Bernard Pullian and Jermone English walked to a convenience store to buy drinks. Pugh and three cohorts were in a vehicle nearby, spotted Pullian and English, and decided to rob them. When Pullian and English exited the store and started home, Pugh's accomplice pulled the car alongside them.

Pugh exited the rear driver's side door. Pullian immediately recognized Pugh because he had seen Pugh at his apartment complex. Pugh was a black man with gold teeth and dreadlocks that were pulled into a ponytail. Pugh had a firearm.

Another man who was brown-skinned with a low haircut, exited from the front passenger door, demanded that Pullian and English "get down," and fired a shot into the air. Pullian and English ran.

One of the perpetrators pursued English and robbed him at gunpoint. English then heard gunshots and saw Pugh (whom he described as the man with dreadlocks and gold teeth) standing in the street shooting. Pugh shot Pullian in the leg.

---

[3] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. Doc. 10-2, Ex. B (Trial Tr.); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

Pullian found a hiding place and phoned 911. During the call, Pullian told the operator that he could identify the person who shot him and that he knew where the shooter lived although he could not identify him by name. Pullian later identified Pugh from a photographic lineup as the man who shot him.

Pugh was charged in Escambia County Circuit Court Case No. 2010-CF-5852, with robbery of Jermone English (Count 1), aggravated battery on Bernard Pullian (Count 2), attempted robbery of Bernard Pullian (Count 3), and assault on Jermone English (Count 4). Doc. 10-1, Ex. A at 1-2.[4] The defense argued reasonable doubt and misidentification. The jury was instructed on the elements of the crimes (including lesser included offenses) and the doctrine of principal liability. Doc. 10-1, Ex. A at 27-42.

The jury found Pugh guilty of the following four crimes: (1) Robbery of Jermone English with a Weapon (with a specific finding that Pugh possessed a weapon during the robbery); (2) Aggravated Battery on Bernard Pullian with Great Bodily Harm and with a Firearm (with specific findings that Pugh actually possessed and discharged a firearm in committing the battery); (3) Attempted Robbery of

---

[4] Citations to the state-court record are to the electronically-filed exhibits attached to the State's answer. Doc. 10. The citation references the docket entry number followed by the lettered exhibit. Citations to page numbers of an exhibit are to the Bates stamp number appearing at the bottom center of the page.

Bernard Pullian (with specific findings that Pugh actually possessed and discharged a firearm during the attempted robbery); and (4) Assault on Jermone English. Doc. 10-1, Ex. A at 43-45. The trial court adjudicated Pugh guilty of the offenses and sentenced him to life imprisonment for the Robbery; a consecutive term of life imprisonment for the Aggravated Battery (with a 25-year mandatory minimum); 20 years of imprisonment for the Attempted Robbery (with a 20-year mandatory minimum) concurrent with Count 2 but consecutive to Count 1; and time served for the Assault. Doc. 10-1, Ex. A at 59-61 (Sentencing Tr.); *Id*. at 73-83 (J. & Sentence). Pugh successfully challenged his life sentence for the Robbery, and was resentenced to 30 years of imprisonment. Doc. 10-3, Ex. C at 375-85. On September 21, 2012, the Florida First District Court of Appeal ("First DCA") affirmed *per curiam* and without written opinion. *Pugh v. State*, 96 So. 3d 890 (Fla. 1st DCA 2012) (Table) (copy at Doc. 10-7, Ex. G).

On January 25, 2013, Pugh filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, which he twice amended. Doc. 10-8, Ex. H at 108-64 (Am. Mot.), 165-73 (Second Am. Mot.). After an evidentiary hearing where Pugh was assisted by counsel, the circuit court denied relief on all claims. Doc. 10-9, Ex. I at 270-305 (Evidentiary Hr'g Tr.); Doc. 10-8, Ex. H at 213-62 (Order). The First DCA affirmed, except with regard to Pugh's claim that his

sentence for the Aggravated Battery was illegal. The First DCA reversed on that issue and remanded for Pugh's resentencing for the Aggravated Battery. *Pugh v. State*, 202 So. 3d 462 (Fla. 1st DCA 2016) (copy at Doc. 10-12, Ex. L).

The trial court entered a *nunc pro tunc* order resentencing Pugh on the Aggravated Battery to 45 years of imprisonment to run consecutively to his sentence on Count 1 (Robbery). Doc. 10-13, Ex. M at 100-06. The First DCA affirmed the sentence on March 13, 2018, *per curiam* and without written opinion. *Pugh v. State*, 242 So. 3d 1049 (Fla. 1st DCA 2018) (Table) (copy at Doc. 10-17, Ex. Q).

 On December 26, 2018, Pugh filed a *pro se* petition for writ of habeas corpus in the First DCA alleging that his direct-appeal counsel was ineffective. Doc. 10-18, Ex. R. The petition was denied on the merits. *Pugh v. State*, 312 So. 3d 61 (Fla. 1st DCA 2021) (Table) (copy at Doc. 10-21, Ex. U).

Pugh filed his *pro se* federal habeas petition on July 16, 2021. Doc. 1. Pugh's petition raises one claim of ineffective assistance of trial counsel, which has two sub-parts. Doc. 1. The parties agree that Pugh presented his claim to the state courts as Grounds I and II of his first amended Rule 3.850 motion. Doc. 1 at 12-13; Doc. 10 at 5, 13, 20-21. The State asserts that Pugh is not entitled to habeas relief because he fails to satisfy § 2254(d)'s demanding standard.

## II. RELEVANT LEGAL PRINCIPLES

**A.        Section 2254 Standard of Review**

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[5] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

---

[5] Unless otherwise noted, references to Supreme Court's *Williams* case are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403-13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).

As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has emphasized often that a state prisoner's burden under

§ 2254(d) is "difficult to meet, . . .  because it was meant to be." *Richter*, 562 U.S.

at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, <u>a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement</u>.

*Richter*, 562 U.S. at 102-03 (emphasis added).

A federal court may conduct an independent review of the merits of a

petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See*

*Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue

unless the petitioner shows that he is in custody "in violation of the Constitution or

laws and treaties of the United States."  28 U.S.C. § 2254(a).

**B.      Federal Law Governing Claims of Ineffective Assistance of Counsel**

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

The inquiry under *Strickland*'s performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and to show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different trial outcome. *See Strickland*, 466 U.S. at 694. A

reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III. Discussion

**Ground One**    **"Petitioner was denied the counsel, fair trial, and due process of law guaranteed him by the 14th Amendment. Accord: Strickland v. Washington, 466 U.S. 668 (1984)." Doc. 1 at 6.**

Pugh alleges that trial counsel was ineffective for (1) failing to impeach Bernard Pullian by asking him about his prior conviction for a driving offense and for lying to law enforcement about his name; and (2) failing to call an expert witness to testify about Pullian's alcohol consumption to undermine his identification of Pugh.

### A. Sub-Claim One: Failure to Question Pullian About His Prior Convictions

Pugh presented this claim to the state courts as "Claim One" of his first amended Rule 3.850 motion. Doc. 10-8, Ex. H at 113-17. The state circuit court denied relief after an evidentiary hearing. The order denying relief identified the two-pronged *Strickland* standard as the controlling legal standard, Doc. 10-8, Ex. H at 214, and denied relief as follows:

> **Claim One**—Defendant first claims that his attorney erred in not impeaching witness Bernard Pullian with a prior felony conviction and a crime involving dishonesty. At a deposition, Mr. Pullian admitted that he had previously been convicted of a felony count of driving with a suspended license. Mr. Pullian added that he had also given officers false identification when he was arrested for driving with a suspended license. Neither offense, however, was brought up when Mr. Pullian testified at trial. Counsel's failure to impeach the witness, Defendant claims, was error and requires that he be granted a new trial.

Page 12 of 26

Mr. Pullian testified he was playing card with his friends after work on December 9, 2010. Pullian said that he wanted to by some drinks that night and decided to walk to the Circle K with Jerome [sic] English. Mr. Pullian said that he was not impaired that evening. As they were leaving the store, Mr. Pullian said a car pulled in front of them. A black man with dreadlocks and dressed in a black sweatshirt then jumped out of the back seat. The man also had gold teeth according to Mr. Pullian's testimony. Mr. Pullian said that he had seen the man before at the Truman Arms apartments where he resided. Another man then got out of the car and was carrying a gun. Mr. English said he gave one of the men approximately $22.00 after he was threatened with a gun. Mr. Pullian said he began running away when he was shot in the calf and that he fell to the ground. He was later treated at Baptist Hospital for his injuries.

After being shot, Mr. Pullian called 911 on his cell phone. A copy of the 911 call was played to the jury. During the call, Mr. Pullian said that he could identify one of the men who had robbed him. Later, Mr. Pullian was able to identify Defendant from a photographic lineup prepared by law enforcement. Mr. Pullian said that Defendant was the man he saw with the dreadlocks and the gold teeth on December 9, 2010. Mr. Pullian testified that he had no doubt with respect to his identification of Defendant. Mr. English, however, testified at trial that Defendant was not the man who had robbed them.

At the evidentiary hearing, defense counsel Brandon Morris stated that he was aware of Mr. Pullian's prior record but did not want to "beat up" on the witness in front of the jury since he had been shot during the offense. Regarding trial counsel's performance, there is a strong presumption pursuant to Strickland that trial counsel's conduct falls within the wide range of reasonable professional assistance. Counsel, accordingly, is not ineffective for strategic decisions that, in hindsight, did not work to the defendant's advantage. Mansfield v. State, 911 So. 2d 1160, 1174 (Fla. 2005). Furthermore, "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."

> <u>Souffrant v. State</u>, 994 So. 2d 407, 410-11 (Fla. Dist. Ct. App. 2008).
> Since the decision to not impeach the witness was a strategic one, the
> Court finds counsel cannot be held ineffective on this basis. Even,
> however, if the strategy by counsel was not reasonable, the claim would
> still fail since Defendant cannot show prejudice.
>
> As noted, Defendant would have to establish that, absent the
> error, there is a reasonable probability that the outcome of the
> proceeding would have been different. Even if the jury heard that the
> victim had a prior record, the Court is not persuaded that Defendant
> would have been found not guilty. Mr. Pullian identified Defendant as
> the man who tried to rob him in a photographic lineup and at trial. There
> was no evidence that [this] victim had a motive to lie about Defendant's
> participation in the robbery and any evidence about prior offenses
> would not have impacted the verdict. This claim, accordingly, is denied.

Doc. 10-8, Ex. H at 214-16 (footnote omitted). The First DCA summarily affirmed,

stating: "We affirm, without further comment, the trial court's denial of Appellant's

ineffective assistance of counsel claims (Claims 1-3) raised pursuant to rule 3.850."

Doc. 10-12, Ex.. L.

The First DCA's summary affirmance is an "adjudication on the merits" of

Pugh's claim, and is reviewed under § 2254(d)'s deferential standard. *See Richter*,

562 U.S. at 99 ("When a federal claim has been presented to a state court and the

state court has denied relief, it may be presumed that the state court adjudicated the

claim on the merits in the absence of any indication or state-law procedural

principles to the contrary); *id*. at 100 ("This Court now holds and reconfirms that §

2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Where, as here, there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment, federal courts employ the following "look through" presumption: "[T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. —, 138 S. Ct. 1188, 1192 (2018). Consistent with *Wilson*, this court presumes that the First DCA rejected Pugh's claim for the reasons provided by the state circuit court.

The state court's decision is not "contrary to" clearly established Federal law, because the state court identified and applied the two-part *Strickland* standard. *See Williams*, 529 U.S. at 405-06 (interpreting § 2254(d)(1)). To obtain habeas relief, therefore, Pugh must show that the state court's application of the *Strickland* standard was unreasonable.

A fairminded jurist could concur in the state court's conclusion that counsel's failure to question Mr. Pullian about his prior convictions was not deficient performance. Defense counsel questioned Pullian extensively about his

identification of Pugh as the man who exited the driver's side rear door. Doc. 10-2, Ex. B at 135-37. Pullian was firm and unequivocal that the man was Pugh. *Id*.

Counsel then attempted to undermine Pullian's identification of Pugh as the shooter. Pullian confirmed that it was Pugh's cohort, not Pugh, who fired the shot into the air. *Id*. at 136-37. Pullian also acknowledged that after the shot was fired into the air, he was very scared and his attention was focused on where he should run and what would happen if he were killed. *Id*. at 137-38. By the end of cross-examination, Pullian had stated that (1) he never saw Pugh with a weapon, (2) he never saw Pugh fire a gun, and (3) he could not tell which one of the perpetrators shot him because he was running away from them. *Id*. at 142-43.

At the postconviction evidentiary hearing, counsel explained that his decision not to question Pullian about his prior convictions was a tactical one:

Q [The State].  Mr. Morris, as a matter of strategy during the course of the trial then you chose not to impeach the victim with the fact that he had been previously convicted of a felony; is that right?

A.  That's correct. I didn't –

Q. Why did you make that decision?

A.  I made the decision because he walked with a noticeable limp. He had permanent nerve damage in his leg. I didn't want it to – to appear to the jury that I was beating up on him. And the felony at the time was a very minor felony. When I say "minor," it was – it was either a driving offense or – is that what it was, a driving offense, I think –

Q.  That's what has been alleged.

A.  And so, yeah, I didn't want it to appear that I was beating up on the witness given the injury that he had sustained.

Q.  So in the course of the trial, you decide that because this witness had been injured in the crime that was committed, that it was better not to try to impeach him or make it look like you were beating up on him because he had a prior, minor felony conviction?

A.  That is correct. That is correct.

Doc. 10-9, Ex. I at 281-82.[6]

"Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment." *Strickland*, 466 U.S. at 681. Counsel's decision was based on his professional judgment. A reasonable attorney in counsel's position could decide not to go further in his cross-examination—by attacking Pullian's credibility with questions about his

---

[6] Defense counsel also testified that, "In hindsight, I would have actually impeached the individual [Mr. Pullian] now." Doc. 10-9, Ex. I at 280. But that statement is not conclusive on the issue of deficient performance. "After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Richter*, 562 U.S. at 109-10.

driving offense—because it risked the jury viewing counsel as "beating up on" a victim who had suffered a life-changing injury.

The state court reasonably respected counsel's strategic decision, and reasonably concluded that trial counsel's performance was not deficient. The state court's rejection of Pugh's first sub-claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. Pugh is not entitled to habeas relief on this sub-claim.

### B.    *Sub-Claim Two: Failure to Call Expert Witness*

Pugh alleges that Pullian's medical records indicated that he was "inebriated" at the time of the incident. Doc. 1 at 9. Pugh faults trial counsel for failing to call an expert witness to testify about how Pullian's intoxication and self-report of chronic heavy alcohol use could have affected his perception and memory of the incident, including his identification of Pugh.

Pugh presented this claim to the state courts as "Claim Two" of his first amended Rule 3.850 motion. Doc. 10-8, Ex. H at 118-22. The state circuit court denied relief after an evidentiary hearing and after allowing Pugh's postconviction counsel to supplement the record with affidavit testimony from an expert. Doc. 10-9, Ex. I at 295-99; Doc. 10-8, Ex. H at 193-95 (Compo Aff.).

The state circuit court's written order identified the two-pronged *Strickland* standard as the controlling legal standard, Doc. 10-8, Ex. H at 214, and denied relief for these reasons:

> **Claim Two**—Defendant next argues that counsel erred by not hiring an expert to testify about the impact of alcohol abuse on the victim's ability to perceive the event. A trial, defense counsel argued in closing that Mr. Pullian had been drinking on the night the robbery occurred. In support of this claim that an expert should have testified, Defendant submitted an affidavit from Dr. Nadja Compo regarding the effect of alcohol on witness memory and eyewitness identification. Dr. Compo wrote that, although Mr. Pullian had a history of excessive drinking, there was no testimony that he was intoxicated at the time the robbery occurred. In addition, Dr. Compo noted that studies on the impact of alcohol on eyewitness identification "have yielded mixed results." She did not believe that, had an expert been called on witness memory and alcohol, the jury would have reached a different verdict.

> Dr. Comp also discussed in her affidavit the unreliability of eyewitness identification regardless of alcohol consumption. Various studies, according to Dr. Compo, determined that eyewitness accuracy is impacted by certain variables, including viewing conditions, the presence of a weapon and emotional stress. The accuracy of a photographic lineup, similarly, is also subject to several factors according to Dr. Compo. Dr. Compo writes that an expert in this area "could have resulted in a different verdict."

> Even if the expert testimony were admissible pursuant to Frye or Daubert, the Court again finds that there is no prejudice since there is not a reasonable probability that the outcome would have been different. Any evidence from an expert on eyewitness testimony, the Court finds, would have been of minimal relevance and does not support the granting of a new trial.

Doc. 10-8, Ex. H at 216-17 (footnote omitted). The First DCA affirmed without comment. Doc. 10-12, Ex.. L.

The First DCA's summary affirmance is an "adjudication on the merits" of Pugh's claim, and is reviewed under § 2254(d)'s deferential standard. *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson*, this court presumes that the First DCA rejected Pugh's claim for the reasons provided by the state circuit court. *Wilson*, 138 S. Ct. at 1192.

The state court's decision is not "contrary to" clearly established Federal law, because the state court identified and applied the two-part *Strickland* standard. *See Williams*, 529 U.S. at 405-06 (interpreting § 2254(d)(1)). To obtain habeas relief, therefore, Pugh must show that the state court's application of the *Strickland* standard was unreasonable.

In reviewing the state court's decision, this court defers to the state court's findings of fact, because they are amply supported by the record and because Pugh has not rebutted them with clear and convincing evidence to the contrary. *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) ("AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence.") (citing 28 U.S.C. § 2254(e)).

A fairminded jurist could concur in the state court's conclusion that Pugh failed to satisfy *Strickland*'s prejudice prong. Trial counsel testified that he decided not to retain an expert witness and to instead rely on the jury's common-sense review of Pullian's medical records, because an expert would not have been helpful:

> Q [Pugh's Postconviction Counsel].  But why did you not call an expert to tell the jury what those records meant?
>
> A [Trial Counsel Morris].  Well – "meant" regarding what?
>
> Q.  I mean, as far as how alcohol can affect someone's ability to identify someone else or how an alcoholic can have blackouts or how an alcoholic might perceive something not the way it is if they are in the throws of alcoholism. Why didn't you call an expert to testify to that?
>
> A.  Well, I guess we had – we had knowledge of his drinking that night. Whether or not he was an alcoholic, we don't – we didn't know. We do know that in the medical records that were – that were placed into evidence, he had told the nurse, as I recall, that he had been drinking and there was evidence that he had drank – at least he had told the nurse that he had drank quite a bit on a weekly basis.
>
> As far as calling an expert, you know, we were basically just going to rely on people's experience and knowledge as to – as to the effects of alcohol for our argument in closing, which we did ultimately argue.
>
> Q.  So you expected a lay jury to understand the medical complexities of alcoholism and the effects on a person?
>
> A.  I expect the jury to understand the effects of alcohol on a person.
>
> Q.  And in part of those medical records, it – I believe it said that there was something in there that Mr. Pullian said he drank something like 84 beers a week?

A.  I believe – that sounds familiar of what he told the nurse.

Q.  Okay. But you did not call an expert to tell the jury how that could affect –

A.  I did not call an expert.

Q.  Okay All right. Was that part of the trial strategy?

A.  To not call an expert?

Q.  Yeah.

A.  That's correct. Had I actually believed an expert was warranted for something like that, I would have actually called an expert.

Doc. 10-9, Ex. I at 276-78.

On cross-examination, trial counsel clarified that, concerning Mr. Pullian's alcohol use, the issue was not whether Pullian was an alcoholic, "[t]he issue was whether or not he had been drinking." *Id*. at 287-88. Counsel felt that Pullian's medical records, including his statements to medical personnel, brought forth the issue of Pullian's alcohol consumption the night of the incident sufficiently for the jury to use their common sense. *Id*. at 288. Trial counsel also noted that "there was not a lot of evidence that he was very impaired. In fact, I want to say that – and again, you know, I feel as though there was evidence that he really wasn't impaired at all[.] . . . We just wanted to argue it in the medical records because that's what he had stated to the nurse." *Id*. at 288.

Page 22 of 26

Pugh's postconviction expert—Dr. Compo—reviewed Pullian's medical records, his pretrial deposition testimony, his trial testimony, and the arrest report. Doc. 10-8, Ex. H at 193. Compo stated this opinion:

> Despite the fact that the sheer amount of alcohol reportedly consumed per week suggests regular and extensive alcohol consumption by Mr. Pullian, there is no direct evidence that Mr. Pullian had a considerable blood alcohol concentration at the time he witnessed the robbery. Alcohol breath tests were never performed by the responding officer and neither breath nor blood alcohol tests (the latter being much mor reliable) were performed at the hospital.

*Id*. at 193. Dr. Compo stated that there were only "a handful" of studies that investigated the effects of alcohol on eyewitness identification tests, and that those studies "yielded mixed results." *Id*. at 193. Compo concluded:

> Taken together, there is mixed and limited evidence that alcohol intoxication may affect identification accuracy at a BAC level of .08 and it is unclear to what extent the identifying eyewitness was intoxicated at the time of the crime and/or at the time of the identification. It is therefore unlikely that expert witness testimony on this topic would have resulted in a different verdict.

*Id*. at 194.

On this record, a fairminded jurist could agree with the state court's conclusion that Pugh failed to satisfy *Strickland*'s prejudice prong. Pugh failed to establish that there was a substantial likelihood the result of his trial would have been different had his proposed expert testified concerning Pullian's alcohol consumption.

The state court's rejection of Pugh's second sub-claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. Nor was it based on an unreasonable determination of the facts.

For the reasons stated above, Pugh is not entitled to habeas relief on his claims that he was denied his constitutional right to effective assistance of counsel.

## IV.  CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"

*Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327).  Here, Petitioner has not made the requisite demonstration.  Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  28 U.S.C. § 2254 Rule 11(a).  If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V. CONCLUSION

It is **ORDERED** that: The clerk of court shall change the docket to reflect that Ricky D. Dixon has been substituted as the Respondent in this action.

In addition, for the reasons set forth above the undersigned respectfully **RECOMMENDS** that:

1.  The petition for writ of habeas corpus, Doc. 1, challenging the judgment of conviction and sentence in *State of Florida v. John Lee Pugh*, Escambia County Circuit Court Case No. 2010-CF-5852, be **DENIED**.

2.  The District Court **DENY** a certificate of appealability.

3.  The clerk of court close this case file.

At Panama City, Florida, this <u>29th</u> day of June, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**